**In re ENRON CORP., et al., Reorganized Debtors.**

**No. 01 B 16034(AJG).**

United States Bankruptcy Court, S.D. New York.

July 11, 2005.

258

Cadwalader, Wickersham & Taft LLP, New York, Edward A. Smith, Esq., Of Counsel, Washington, DC, Mark C. Ellenberg, Esq., David F. Williams, Esq., Of Counsel, Special Counsel for Reorganized Debtors.

State of California, Department of Justice, Office of Attorney General, Sacramento, CA, Bill Lockyer, Esq., Mark Breckler, Esq., Irene K. Tamura, Esq., Martin Goyette, Esq., Of Counsel, Felderstein Fitzgerald Willoughby & Pascuzzi LLP, Sacramento, CA, Steven H. Felderstein, Esq., Paul J. Pascuzzi, Esq., Christa K. McKimmy, Esq., Of Counsel, for the People of the State of California and the California Department of Water Resources.

Kramer Levin Naftalis & Frankel LLP, New York City, Philip Bentley, Esq., P. Bradley O'Neill, Esq., Jonathan T. Koevary, Esq., Of Counsel, for Southern California Edison Company.

OPINION SUSTAINING DEBTORS' OBJECTION TO PROOFS OF CLAIM NOS. 12172–12174 AND 12252–12257 FILED BY BILL LOCKYER, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA; TO PROOFS OF CLAIM NOS. 12498, 12500, 24685, AND 24687 FILED BY CALIFORNIA DEPARTMENT OF WATER RESOURCES; AND TO PROOFS OF CLAIM NOS. 22630–22632 FILED BY SOUTHERN CALIFORNIA EDISON COMPANY REGARDING FEDERAL LAW CLAIMS IN ELECTRICITY MARKET

ARTHUR J. GONZALEZ, Bankruptcy Judge.

On October 11, 2002, the Attorney General of the State of California (the "State") filed separate proofs of claim in unliquidated amounts on behalf of the People of the State of California against Enron Corporation ("Enron") and certain of its affiliated entities (collectively, the "Debtors") in the following nine cases: Enron (Claim No. 12173); Enron North America Corp. ("ENA") (Claim No. 12172); Enron Power Marketing, Inc. ("EPMI") (Claim No. 12174); Enron Energy Services, Inc. ("EESI") (Claim No. 12255); Enron Energy Services, LLC (Claim No. 12254); Enron Energy Services Operations, Inc. (Claim No. 12257); Enron Energy Marketing Corp. (Claim No. 12256); and Enron Capital & Trade Resources International Corp. (Claim No. 12253). The Attorney General also filed proofs of claim on behalf of the California Department of Water Resources ("CDWR") in unliquidated amounts against the Debtors in the following cases: Enron (Claim No. 12500); ENA (Claim No. 12498); EPMI (Claim No. 24685); and EESI (Claim No. 24687). On March 6, 2003, Southern California Edison Company ("Edison") filed proofs of claim in unliquidated amounts against the Debtors in the following cases: Enron (Claim No. 22630); EESI (Claim No. 22631); and EPMI (Claim No. 22632).

The State, CDWR and Edison (collectively, the "Claimants") allege that the Debtors manipulated energy markets in California and overcharged for energy through unlawful and anti-competitive acts during the western power crisis of 2000 and 2001. They maintain the alleged manipulation in the electricity market constitutes a violation of the federal antitrust law and regulations, and seek disgorgement, restitution, actual and treble damages together with interest and injunctive relief. On March 10 2005, the Debtors filed objections to the Claimants' federal law claims and argued that the Federal Power Act (the "FPA") preempts the federal laws and the filed rate doctrine precludes consideration of these claims.

The issues before the Court are whether (i) the federal law claims are preempted by the FPA; and (ii) whether such claims are precluded by the filed rate doctrine. The Court finds that because the Federal Energy Regulatory Commission ("FERC") has exclusive jurisdiction over interstate sales of wholesale electricity, the filed rate doctrine precludes consideration of such federal law claims. For the reasons set below, the Court will not determine the preemption issue.

## I. BACKGROUND

Commencing on December 2, 2001, and from time to time continuing thereafter, the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On July 15, 2004, the Court entered an Order confirming the Debtors' Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors (the

"Plan") in these cases. The Plan became effective on November 17, 2004.

This litigation arises out of the California energy crisis of 2000–01. Prior to the energy crisis, the California legislature had passed Assembly Bill 1890[1] (the "Bill") to create two non-governmental entities, the California Power Exchange (the "PX") and the California Independent System Operator (the "ISO"), to operate markets and manage the sale of electricity. The PX and the ISO were organized under California law, but regulated by FERC. *California v. Dynegy, Inc.*, 375 F.3d 831, 850 (9th Cir.2004). The central transactions, wholesale sales of energy in interstate commerce, were governed by FERC approved rules and a FERC "jurisdictional" ISO and PX. Further, the centralized wholesale spot electricity markets operated by the ISO and the PX were established subject to FERC review and approval. The ISO and the PX served as clearinghouses. Since August 2, 2000, FERC has commenced refund proceeding, and partnership and gaming proceeding to investigate certain of the Debtors. FERC found that the Debtors engaged in gaming[2] in the form of inappropriate trading strategies and further engaged in the deliberate submission of false information or the deliberate omission of material information. *Enron Power Mktg., Inc., et al.*, 106 FERC ¶ 61,024, 2004 WL 1483824 (2004). Both proceedings are ongoing, including the determination of remedies by FERC.

## II. DISCUSSION

▪ The threshold question regarding the filed rate doctrine before the Court is whether the Court would have to determine a tariff. The filed rate doctrine is essentially a rule of jurisdiction whose applicability is circumscribed by both the congressionally mandated jurisdiction of the regulatory agency and the occurrence of the triggering event of filing a rate or tariff. The filed rate doctrine is applicable where rates were filed with a federal regulatory agency and where the offending transactions are carried out with reference to a filed tariff. *E. & J. Gallo Winery v. Encana Energy Servs., Inc.*, Case No.CVF 03–5412 AWILJO at 15, 2005 WL 1657063. The Court recognizes that the filed rate doctrine "forbids a regulated entity from charging rates for its service other than those properly filed with the appropriate federal regulatory authority." *Ark. L.A. Gas Co. v. Frank Hall*, 453 U.S. 571, 577–78, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981). The Court also recognizes that the purpose of the doctrine is "preservation of the agency's primary jurisdiction over reasonableness of rates and the need to insure that regulated companies charge only those rates of which the agency has been made cognizant." *City of Cleveland v. FPC*, 525 F.2d 845, 854 (D.C.Cir.1976). Courts have consistently held that the filed rate doctrine applies to federal antitrust actions relating to rates established by federal agencies. *Ark. L.A. Gas* 453 U.S. 571, at 580, 101 S.Ct. 2925; *County of Stanislaus v. Pacific Gas and Elec. Co.*, 114 F.3d 858, 863 (9th Cir.1997); *In re Western States Wholesale Natural Gas Antitrust Litigation*, 368 F.Supp.2d 1110, 1114–15 (D.Nev.2005).

▪ The Debtors argue that FERC has exclusive jurisdiction over whether whole-

---

1. 1996 Cal. Stat. 854

2. The ISO tariff, through the ISO's Market Monitoring and Information Protocol defines gaming, in part, as "taking unfair advantage of the rules and procedures set forth in the PX or the ISO tariffs, Protocols or Activity Rule . . . to the detriment of the efficiency of, and of consumers in, the ISO markets." *Am. Electric Power Service Corp., et al.*, 103 FERC ¶ 61,346, 2003 WL 21480249 (2003).

sale electricity price is "just and reasonable." The Debtors assert that the federal law claims necessarily require the Court to determine whether rates were reasonable or whether the Debtors violated applicable FERC approved tariffs. Under the filed rate doctrine, once FERC determines that a rate is "just and reasonable," the courts cannot authorize a departure from that rate. The Claimants do not contest such assertion by the Debtors. Instead, the Claimants raise two arguments to support that the filed rate doctrine is not applicable here.

■ The first argument made by the Claimants is that the filed rate doctrine is inapplicable because no properly filed rates were on file during the period when the alleged conduct occurred. However, the Claimants relied on the following finding in *California v. FERC*, 383 F.3d 1006, 1016 (9th Cir.2004) to support its position "without the required filings, neither FERC nor any affected party may challenge the rate. Pragmatically, under such circumstances, there is no filed tariff in place at all." *Id.* This argument, however, inappropriately equates the Debtors' alleged violation of the filing requirements with no-filed tariffs. FERC required each seller to file quarterly reports pursuant to FPA § 205(c) 16 U.S.C. § 824d(c) on transaction-specific information about its sales and purchases at market-based rates. The court in *Grays Harbor v. IDACORP Inc.*, 379 F.3d 641, 651 (9th Cir.2004), concluded, "while market-based rates may not have historically been the type of rate envisioned by the filed rate doctrine, they do not fall outside the purview of the doctrine."

Further, the Court agrees with the opinion of the *California v. FERC* court which concluded that "the reporting requirements are an integral part of a tariff, with FERC's implied enforcement mechanisms sufficient to provide substitute remedies for the obtaining of refunds for the imposition of unjust, unreasonable and discriminatory rates." 383 F.3d at 1016. On August 13, 2002, FERC's Initial Report in Docket No. PA02–2–000 concluded that the Debtors engaged in the deliberate submission of false information or the deliberate omission of material information.[3] Then, FERC concluded that such behavior constituted market manipulation and resulted in unjust and unreasonable rates and violated the express requirements in the orders allowing the Debtors to make sales at market-based rates. 106 FERC ¶ 61,024. As noted by FERC,

implicit in Commission orders granting market-based rates is a presumption that a company's behavior will not involve fraud, deception or misrepresentation. Companies failing to adhere to such standards were and are subject to revocation of their market-based rate authority. The Debtors were expressly directed, when they were granted market-based rate authority, to inform the FERC promptly of changes in status (which would include changes in their generation market shares) that reflect a departure from the characteristics that the FERC relied upon in granting market-based rate authority. *Id.*

Moreover, the Court in *California v. FERC*, indirectly recognized the application of the filed rate doctrine when marketers had not properly reported to FERC where such improper reporting affected the reasonableness of the tariff approved by FERC. 383 F.3d at 1016. Without the availability of retroactive refunds, "[p]ar-

3. FERC found that the Debtors failed to inform FERC in a timely manner of changes in their market shares that resulted from their gaining influence/control over others' facilities, as required under their market-based rate authorization. 106 FERC ¶ 61,024.

ties aggrieved by the illegal rate would have no FERC remedy, and the filed rate doctrine would preclude a direct action against the offending seller. That result does not comport with the underlying theory or the regulatory structure established by the FPA." *Id.*

The second argument made by the Claimants is that the filed rate doctrine is not applicable because the issue presented before the Court is distinguishable from those in *Grays Harbor* and *Snohomish County v. Dynegy Power Marketing Inc.,* 384 F.3d 756 (9th Cir.2004). The plaintiff in *Snohomish* brought an action against a company that engaged in market manipulation during the energy crisis in violation of state antitrust and unfair competition law. The court confirmed that the filed rate doctrine applies because the court could not determine the rates that "would have been achieved in a competitive market." *Id.* at 761. Similarly, the court in *Grays Harbor* rejected the request from the plaintiff for a determination of the "fair price." 379 F.3d at 645. Here, the Claimants argue that they are not asserting a price which should be paid in a competitive market as the benchmark for a calculation of a remedy. Rather, the Claimants maintain that the remedy would be unrelated to the ISO tariff and the Court would not have to determine a non-manipulated rate because FERC has done so. The Claimants argue that it is merely requesting the Court to determine liability, and thereafter, remand to FERC for a determination of remedies.

The Ninth Circuit in *California v. FERC* examined the substance of the law and remanded to FERC for the determination of remedies. The court there declined to order refunds to a state because the court reasoned it was more appropriate for FERC to consider its remedial options in the first instance. 383 F.3d at 1018. The substantive law examined by the court in *California v. FERC* concerned whether retroactive refunds were legally available. *Id.* As such, no liability issue was raised and determined by that court. Further, the Court finds that determining the liability or the legal right of the Claimants against the Debtors for violation of the federal antitrust law would have to be measured by the tariff.

In addressing the right of action that a violation of the antitrust laws give to one who has been injured in its business or property, the Supreme Court in *Keogh v. Chicago & N.W.R.Y. Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), stated that "[i]njury implies violation of a legal right" *Id.* at 163, 43 S.Ct. 47. The Supreme Court concluded that "the legal rights of [a] shipper as against [a] carrier in respect to a rate are measured by the published tariff." *Id.* at 163, 43 S.Ct. 47. Justice Brandeis explained "[a] rate is not necessarily illegal because it is the result of a conspiracy in restraint of trade in violation of the Anti–Trust Act. What rates are legal is determined by the Act to Regulate Commerce. Under Section 8 of the latter act ... the exaction of any illegal rate makes the carrier liable to the 'person injured thereby for the full amount of damages sustained in consequence of any such violation.'" *Id.* at 162, 43 S.Ct. 47. Thus, the finding of liability in antitrust laws would be integral to the Court's determination of whether the Debtors are liable due to their violations of the federal antitrust law and regulations. For instance, the Court could not determine the overcharge claim owed by the Debtors for any electricity market manipulation without first deciding the reasonableness of the filed tariff.

Moreover, to award monetary relief, the Court would have to determine a "fair price." Thus, the filed rate doctrine bars

the Court from awarding monetary damages sought by the Claimants. Nonetheless, the Court finds that injunctive relief would also be unavailable to the Claimants. The Court agrees with the Ninth Circuit's decision in *Snohomish*, which declined to grant injunctive relief because such relief is barred by the filed rate doctrine. 384 F.3d at 762. "Remedies for breach and non-performance of FERC-approved operating agreements in the interstate wholesale electricity market fall within the exclusive domain of FERC." *Dynegy*, 375 F.3d at 836.

The Supreme Court case, *Arkansas Louisiana*, further supports the Court's position that the filed rate doctrine should apply here. "Under the filed rate doctrine, FERC alone is empowered to make that judgment, and until it has done so, no rate other than the one on file may be charged." 453 U.S. 571, at 580–84, 101 S.Ct. 2925, 69 L.Ed.2d 856. The decisions from the Second Circuit in *Sun City Taxpayers' Association v. Citizens Utilities Co.*, 45 F.3d 58 (2d Cir.1995) and *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17 (2d Cir.1994), provide an additional basis for dismissal of the Claims sought by the Claimants. The Second Circuit in *Sun City Taxpayers' Association* affirmed the decision from the district court, which had declined the plaintiff's invitation to find a fraud exception to the filed rate doctrine. In determining whether the filed rate doctrine applied, the court focused on the impact the court's decision would have on agency procedures and rate determination. *Sun City Taxpayers' Ass'n v. Citizens Utils. Co.*, 847 F.Supp. 281, 291 (D.Conn. 1994). The Second Circuit in *Wegoland* recognized that the filed rate doctrine exists for reasons independent of the type of plaintiff maintaining the action. Those reasons include that (a) legislatively appointed regulatory bodies have institutional competence to address rate-making is-

sues, (b) courts lack the competence to set utility rates, and (c) the interference of courts in the rate-making process would subvert the authority of rate-setting bodies and undermine the regulatory regime. 27 F.3d at 21.

Therefore, having considered the policy objectives, the Court finds that granting the relief sought to Claimants would frustrate FERC's jurisdiction afforded by Congress. The Court lacks authority to impose a different rate than the one approved by a federal agent. Any other conclusion departing from this principle would undermine the filed rate doctrine. The Court, therefore, rejects the Claimants' challenge to the application of the filed rate doctrine. Accordingly, the Court finds that the filed rate doctrine bars the relief sought by the Claimants.

The Debtors argue that the antitrust law and regulations are preempted by the FPA. However, the Debtors primarily focus on the argument against state antitrust law claims. By comparison, the Claimants argue that the federal antitrust law and regulations are not preempted by the FPA because courts have referred the federal antitrust law claims related to filed tariffs determined by regulatory commissions. In supporting its assertion, the Claimants cite the Supreme Court's decisions in *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), and *California v. Federal Power Commission*, 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962). In both cases, the Supreme Court found that Congress does not intend to bar the government from bringing actions in violation of antitrust laws related to filed tariffs before regulatory commissions.

Having reviewed these cases, the Court disagrees with the Claimants' argument and finds them distinguishable from the instant case. In *California v. Federal Power Commission*, a gas company filed a

motion to dismiss the antitrust suit pursuant to the Clayton Act, § 7 as amended 15 U.S.C.A. § 18, or in the alternative, to stay it, pending completion of the proceedings for its authority to acquire another company's assets pursuant to the Natural Gas Act (the "NGA"), § 7(c) as amended 15 U.S.C.A. § 717f(c), before the Power Energy Commission. 369 U.S. at 483, 82 S.Ct. 901. In *Otter Tail Power*, the government brought an action against an electric power company to enjoin violations of the Sherman Act, 15 U.S.C.A. § 2. 410 U.S. at 368, 93 S.Ct. 1022. In order to protect market competition in certain cases, Congress did not expressly displace federal antitrust laws.

However, a critical distinction between the instant matter and the two cited cases is that there is a regulatory scheme against anti-competitive behavior that has been entrusted to FERC in the instant case. In contrast, the court in *California v. Federal Power Commission* concluded that the NGA did not contain a provision to immunize the carriers involved in the mergers from the Clayton Act. 369 U.S. at 485, 82 S.Ct. 901. "The Commission's standard, set forth in § 7 of the NGA, will serve 'the public convenience and necessity.' If existing natural gas companies violate the antitrust laws, the Commission is directed by § 20(a) to 'transmit such evidence' to the Attorney General." *Id.* at 486, 82 S.Ct. 901. Similarly, the Court in *Otter Tail Power* found that the limited authority of the Federal Power Commission to order interconnections was not intended to be a substitute for the Sherman Act. 410 U.S. at 375, 93 S.Ct. 1022. In *Otter Tail Power*, the FPA does not authorize the FPC to order a power company to wheel electric power over its transmission lines; accordingly, enforcing the Sherman Act against anticompetitive and monopolistic practices on interconnections by the district court did not conflict with authority of the FPC. *Id.* at 376–77, 93 S.Ct.

1022. Moreover, the Supreme Court in *Carnation Co. v. Pacific Westbound Conference*, 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966) declined to grant antitrust immunity to a shipping company because "the provisions of the Shipping Act, 46 U.S.C.A. § 801, can not reasonably be construed as an implied repeal of antitrust regulation of the shipping industry's ratemaking activities." *Id.* at 217, 86 S.Ct. 781. The Shipping Act does not give the Federal Maritime Commission (the "FMC") any mandate to regulate rate competition and the statutory scheme was designed to minimize the role of the FMC. *Square D Co. v. Niagara Frontier Tariff Bureau*, 476 U.S. 409, 422, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986).

■ Here, the FPA provides FERC with broad remedial authority to address anti-competitive behavior. Congress through the FPA, made clear that the interstate "transmission" or "sale" of wholesale energy pursuant to a federal tariff, not merely the "rates," falls within FERC's exclusive jurisdiction. Federal Power Act, 16 U.S.C. § 824e. In fact, FERC has exercised this power to act in the proceedings instituted against the Debtors concerning alleged market manipulation during the energy crisis. FERC has asserted that it "can order disgorgement of monies above the post-October 2, 2000 refunds ordered in the California Refund Proceeding, if it finds violations of the ISO and the PX tariffs and finds that a monetary remedy is appropriate for such violations. It can additionally order additional disgorgement of unjust profits for tariff violations that occurred after October 2, 2000." 103 FERC ¶ 61,346. Further, "implicit in Commission orders granting market-based rates to the marketers is a presumption that a company's behavior will not involve fraud, deception or misrepresentation. Companies failing to adhere to such standards were and are subject to revocation of their market-based rate au-

thority." 106 FERC ¶ 61,024. Under the preemption analysis, allowing the federal antitrust law claims in the wholesale interstate electricity market would appear to encroach upon the authority Congress entrusted exclusively to FERC. Thus, the cited cases by the Claimants are not controlling in the instant case. Because the parties do not substantially further develop their argument on preemption, and as a result of the Court's determination regarding the filed rate doctrine, the Court will not determine the preemption issue.

## III. CONCLUSION

For the foregoing reasons, the Court concludes that the federal antitrust law claims sought by the Claimants concerning electricity market manipulation are precluded by the filed rate doctrine. Therefore, the Court sustains the Debtors' objection to those claims filed by the Claimants.

Counsel for the Debtors is directed to settle an order consistent with this Court's Opinion.